## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

ANA KONO,

                                 Case No. _____

      Plaintiff,

v.

UNIVERSITY OF MIAMI, a private Florida university,
UNIVERSITY OF MIAMI BOARD OF TRUSTEES,
UNIVERSITY OF MIAMI BUSINESS SCHOOL,
an academic unit of the University of Miami, and
Dr. JULIANO LARAN,

      Defendants.

_____/

## COMPLAINT FOR DAMAGES

      Plaintiff, Ana Kono ("Plaintiff" or "Ana") by and through her undersigned counsel, files this Complaint against Defendants, University of Miami ("UM"), University of Miami Board of Trustees ("UM Trustees"), University of Miami Business School ("UM Business School"), and Dr. Juliano Laran ("Dr. Laran") and states as follows:

## SUMMARY OF CLAIMS

      This action is a textbook example of what constitutes a viable Title IX and Section 1983 action given the "deliberate indifference" of UM, UM Trustees and the UM Business School after being placed on notice of Dr. Laran's continued and repeated harassment of Plaintiff and other women, both students and faculty members.  Rather than address the problem when it was initially brought to the attention of those members of the UM Business School who could and should have done something about it, Dr. Laran was instead given full tenure and appointed the PhD Program Coordinator.

Ana had a successful career in advertising and marketing.  She decided to give that up to fulfill her dream of one day being a marketing professor at a well-established university.  To achieve that goal, she was required to obtain a PhD in Marketing from a reputable program.  She chose the UM Marketing PhD Program at the UM Business School and "hitched her wagon" to the rising star of Dr. Laran. That decision proved to be the biggest and most devastating mistake of her life.

Throughout her tenure at UM, Ana was continually mistreated and repeatedly harassed, based upon her sex and age by Dr. Laran. When she attempted to eliminate the problem by finding another faculty member to be her dissertation chair, her problems were further exacerbated as Dr. Laran undertook a conscious and deliberate campaign to assure that no other faculty member would agree to be her dissertation chair, and Ana's "career would be finished before it even started" as Dr. Laran  had previously forewarned if she were to move to another faculty advisor. When Ana spoke to senior faculty members about her situation, she was told that the marketing faculty all knew about Dr. Laran's mistreatment of her and prior female students, but they would do nothing about it as they were all afraid of him, and because of his publications and academic reputation, those in management of UM, UM Trustees and the UM Business School would take no steps to rectify the situation.  With no dissertation committee in place, Ana was forced to leave the UM PhD Marketing Program in the summer of 2017 thereby giving up her dream of one day being a marketing professor at an established university.

## THE PARTIES

1.      Plaintiff, Ana, who is *sui juris,* is a female over forty years of age, a working mother and, a resident of Los Angeles, California.

2.      Defendant, UM, is a private nonsectarian research university, and a not-for-profit Florida corporation located in Coral Gables, Florida, and was at all material times doing business in Miami-Dade County, Florida.

3.      Defendant, UM Trustees, is the governing body of UM, and each of its individual academic units, schools and colleges, and was at all material times doing business in Miami-Dade County, Florida.

4.      Defendant, UM Business School, is an individual academic unit of UM and was at all material times doing business in Miami-Dade County Florida.

5.      Defendant, Dr. Laran, is a fully tenured professor and has been the PhD Program Coordinator for the Marketing Program of the UM Business School since 2015, and he resides in Miami-Dade County, Florida.

## JURISDICTION AND VENUE

6.      This is an action for monetary damages brought pursuant to 42 U.S.C.A. §§1983 and 1988, 20 U.S.C.S. §1681(a), the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution as well as the Constitution of the State of Florida.

7.      Jurisdiction is founded upon 28 U.S.C.A. §§1331 and 1343 as this Complaint arises out of a federal question and a deprivation of Plaintiff's constitutional rights.  Moreover, this Court also has jurisdiction under 20 U.S.C.A. §1332 as there is complete diversity of the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  In addition, this Court has jurisdiction under 28 U.S.C.A. §1367(a) over claims alleging violations of state law that arise out of the same incidents giving rise to Plaintiff's federal claims and form a part of the same case or controversy.

8.      Venue is proper in the Southern District of Florida because, at all relevant times, Defendants conducted, and continue to conduct substantial business in the Southern District of Florida, maintain offices in this district and the events giving rise to the claims asserted occurred in this District.

## MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S CLAIMS

### A.  Plaintiff Leaves Her Successful Marketing Career to Obtain Her PhD In Order to Achieve Her Dream of Becoming a Marketing Professor at a Major University.

9.      After graduating from Colombia University with a Bachelor of Arts in 1997, Plaintiff began a successful and rewarding career in advertising and marketing at Saatchi & Saatchi, a well-respected advertising agency in New York. From there, Ana attended Wharton School of Business at the University of Pennsylvania ("Wharton") and received a Master of Business Administration ("MBA") in 2003, and soon thereafter became a senior marketing executive at several entertainment companies in Los Angeles, California including but not limited to Disney, Warner Brothers and 20th Century Fox.  She eventually became Senior Vice-President of Marketing at RLJ Entertainment, where she led a team of ten marketing professionals and was responsible for all corporate and product marketing strategies and execution for that independent film distributor with over $100 million in annual revenues.

10.      Although she could have continued to advance in her professional career, Ana had decided, even while still at Wharton, working as a teacher's assistant, that her passion was to eventually to become a marketing professor.  To do so, she needed to return to academia and obtain her PhD in Marketing from a respected marketing program.

11.     After a very successful fifteen-year advertising and marketing career, Plaintiff made the decision to pursue a PhD in marketing to achieve her ultimate goal of being a marketing professor at a major university.  For guidance, she reached out to her former marketing mentor at Wharton, Dr. Gavan Fitzsimmons, to obtain his advice on how best to reach her goal.

12.     Dr. Fitzsimmons advised that while it would be possible to enter a PhD program given her background and age, it was best that Ana focus on "rebranding" herself so that she looked more like a student and less like an accomplished marketing executive.

13.     To enhance her candidacy for a reputable PhD programs, Plaintiff secured a research assistant position with a UCLA marketing professor, Dr. Suzanne Shu, and focused her attention and energy on filling out applications, taking the GRE and repositioning myself as an independent, self-reliant and autonomous individual, traits that she was told were critical for her success in PhD programs and future academic positions.  She did this while still consulting with Warner Brothers in marketing and while being a new mother.

**B.  Plaintiff's Decision to Attend UM Business School to Obtain her PhD in Marketing.**

14.     In February 2014, the Marketing Department of UM Business School interviewed Ms. Kono over the telephone. The interview was conducted by Dr. Joseph Johnson, who was then the Marketing PhD Program Coordinator, and Defendant, Dr.  Laran, who was then an Associate Marketing Professor specializing in consumer behavior, an area of particular interest to Ms. Kono.

15.     Later that month, Plaintiff was accepted into the Marketing PhD Program at UM Business School, and she was invited to visit the campus.

16.     During her visit in March, Ana toured and met with most of the marketing faculty alongside another PhD program accepted applicant, who eventually became a classmate when she joined the program later that fall.

17.     Before making the decision to accept the UM Business School's offer, Plaintiff again consulted with Dr. Fitzsimmons to obtain his opinion on the program, its faculty and their reputation.  Dr. Fitzsimmons advised her that the Marketing PhD program at UM Business School was a newly formed program, thus still unproven as an institution.  However, he indicated his familiarity with Dr. Laran's research, that he was the most accomplished researcher in consumer behavior in that department.  He recommended that Plaintiff should only enroll in the UM Business School Marketing PhD program if she were to work with Dr. Laran.

18.     Plaintiff subsequently reached out to Dr. Laran and explained that her acceptance of the offer by UM Business School's Marketing PhD program would be conditional on working with him and should he leave UM for another program, he would give her the option of going with him as his PhD student, which Plaintiff had been advised was a common practice in academia.  He agreed to that condition and Ana subsequently enrolled in the Marketing PhD program at UM Business School in the Fall of 2014.

19.     From there, Ana and her daughter moved cross-country, while Ana's husband stayed behind in Los Angeles for work.  Ana and her daughter moved into Ana's parents' home so her daughter could maintain some normalcy in a day-to-day routine surrounded by family. Additionally, Ana enrolled her daughter in elementary school in Miami.

**C. The UM Entities and Their Responsibilities to Assure Compliance with Title IX by Each of Its Separate Academic Units and Schools.**

20.     UM is a well-respected private university located in Coral Gables, Florida that is a regular recipient of federal funds in the form of student aid, grants and other programs and therefore must comply with Title IX (20 U.S.C.A. §1681 to 1688), in all its activities.

21.     The UM Trustees is the governing body for UM ensuring that all its academic units and schools comport with the requirements of Title IX including stopping sexual harassment of which the faculty and management of the academic units were on notice and to act with deliberate speed to eliminate violative activities.

22.     UM Business School was a separate academic unit of UM, which had in place faculty and staff providing several doctoral programs in business including a PhD in Business with a Marketing Concentration (hereinafter the "Marketing PhD") at all relevant times including from the time of Ana's enrollment in the fall of 2014 until her dismissal in the summer of 2017. On its website and in its solicitation to prospective candidates for the Marketing PhD, the UM Business School distinguished itself "from other programs in the nation by its emphasis on one-on-one mentoring with faculty."

23.     At all relevant times, Dr. Laran was employed by UM as a professor in the Marketing Department of UM Business School including during the enrollment of Plaintiff and presently. In the fall of 2014, Dr. Laran was an associate professor.  While Plaintiff was enrolled as a PhD Marketing student, Dr. Laran was promoted as a full professor with tenure and named as the PhD Marketing Program Coordinator.  On information and belief, students had previously complained of Dr. Laran's inappropriate and harassing nature in course evaluation forms and otherwise even before his promotion to full professor and being named as PhD Marketing Program Coordinator.

**D.  Ana was Assigned to Dr. Laran as his Research Assistant and he was Named her Faculty Advisor.**

24.     Plaintiff began the UM Marketing PhD Program in August of 2014.  The PhD Marketing Program was rather small with faculty and graduate students working closely together. There were two other PhD marketing students that started the PhD Marketing Program with

7

Plaintiff. They were both male. Additionally, there was a sixth-year student, a fourth-year student, and two second-year students, two of which were female. One of the two female students was dismissed from the program approximately a month after the 2014 fall semester began. Ana was the only female her second-year and only one of two females her third year – and the only mother -- in her PhD Program class. Otherwise stated, the Program was very male-dominated. Given her prior 15-year professional career, Ana was also much older than the other students in the graduate program. As agreed, Ms. Kono was assigned to Dr. Laran as her faculty advisor and for her first-year research project.

25.    Almost immediately, Plaintiff began working on a research project that was proposed by Dr. Laran. That research project involved measuring a person's attractiveness and determining how willing someone was to go out on a date with them. At first, Plaintiff did not raise concerns with this research project given Defendant Dr. Laran's highly regarded reputation as an accomplished and successful researcher however, when she subsequently discussed this research project with more seasoned students, they shared the same skeptical reaction to this research with her. The research project only lasted around six months, since the data was not consistently supporting the theory being espoused by Dr. Laran.

26.    During the first semester, Ana found it extremely challenging to find a mutually convenient time to meet with Dr. Laran given her class schedule and his teaching schedule, and they only met in-person a couple of times that semester. Their working relationship at that time was one that relied almost exclusively on communications through email that began in the evening and went on throughout the night. Although, Plaintiff found Dr. Laran very demanding and at times somewhat abrupt, the communications at least into the beginning of the second semester were strictly research and academically focused and did not seem to be of an inappropriate nature.

8

**E.  Highly Inappropriate Comments of a Sexual Nature Made by Dr. Laran Creates Hostile Environment for Plaintiff.**

27.     During the spring semester of 2015, as part of the Marketing PhD program, the department held a 2-day event, where three or four distinguished marketing professors from other universities came to campus to share and present their research in a workshop setting.  It was intended to be both a learning and networking opportunity for students, as it provided them access to cutting-edge research ideas and an opportunity to meet future potential employers.  The event was comprised of two day-time workshops and a night-time dinner.

28.     Dr. Laran communicated to Plaintiff that she was expected to attend not only the day-time workshops and the dinner, but also a bar outing that he had organized that would immediately follow the dinner. He explained to Ana that hiring for a subsequent academic position would be based on her publishing accomplishments and personal relationships, and that socializing at bars was critical to Plaintiff securing a subsequent academic position.  Dr. Laran expressed these expectations of Ana, notwithstanding the fact that she had a young child at home.

29.     Dr. Laran expressly required that Ana and the other graduate students in the PhD Program attend the bar outing.  Because she lived far from the university with her parents and daughter, Ana drove to all events and thus limited her alcohol intake and remained sober throughout the night.

30.     During dinner, the PhD students sat together at the end of the table, which seemed odd to Plaintiff given that the purpose of the dinner was to give the graduate students an opportunity to network with the visiting faculty.  At one point, Dr. Laran left his seat among the faculty at the other end of the table and joined the PhD students.  He was visibly intoxicated.

31.     While sitting with the PhD students, Dr. Laran shared a totally inappropriate story of a sexual nature about his time as a PhD student at the University of Florida. He recounted in graphic detail a night when he found himself at a stranger's home and witnessed a couple, after getting high from cocaine, having sexual intercourse in front of him with the intention that he watch.

32.     Plaintiff felt extremely uncomfortable as this type of sharing of stories of prior sexual escapades by a professor to his students seemed highly inappropriate in her mind.  She was the only female in the group of students that Dr. Laran was talking to and throughout the recitation he focused his attention on Ana who sat across from him.

33.     Although Plaintiff wanted to stand up and leave the group, she did not because the other students were hanging on to every word that Dr. Laran was saying.  She believed that by her leaving, it would be perceived as abrupt and disrespectful.  Instead, she avoided eye contact with him, hoping that he would either leave or change the subject soon.

34.     To her surprise, as Dr. Laran's recount ended, he immediately looked to Ana and asked her "to share her wild stories."  He indicated that given her age, 15-year career, and being a woman of Brazilian descent that she probably had some comparable stories to recount. Plaintiff half-laughed and indicated that she did not have any wild stories. Dr. Laran then stared at her maliciously, and she felt that she had intentionally been singled out by Dr. Laran as the only female in the group.  And this question was not posed to any other male students in the group. The remainder of the night she felt objectified and sexualized having been put in an extremely uncomfortable position.

35.     Had this been the only time that Dr. Laran acted inappropriately toward Ana, she would have probably forgiven this event as a misjudgment on his part.[1]  Unfortunately, this began a pattern of intentional verbal harassment of Plaintiff by Dr. Laran that persisted for the rest of Ana's tenure at UM, despite Plaintiff's efforts to limit her personal contact with him outside of emails relating to pending research assignments.

36.     By April of 2015, Ana's efforts at developing a viable research project with Dr. Laran had reached a dead-end.  After the physical attraction research project that Dr. Laran assigned Ana to unsurprisingly did not prove viable, Plaintiff pitched numerous research ideas that were all rejected by Dr. Laran.  In the second semester and contemporaneous in time to the inappropriate comments refenced above, Plaintiff observed that Dr. Laran's demeanor toward her became very hostile and highly offensive.  He repeatedly ridiculed Plaintiff and on at least one occasion, Dr. Laran told Ana that one of her research proposals was so terrible that even his wife had laughed at it.

37.     Although Dr. Laran belittled all of Plaintiff's research proposals, she was getting very positive feedback for her work in general in the PhD Marketing Program from the other faculty members and other PhD students.  By way of example, Plaintiff's research proposals were well-received and praised by Dr. Caglar Irmak, another tenured faculty member leading the

---

[1] Increasing Sexual harassment has been found particularly in graduate and professional programs in recent years. Sexual harassment in verbal or visual forms was reported by 61.9% of undergraduate women and 44.1% of graduate and professional women. See David Cantor et al., Report on the AAU Climate Survey on Sexual Assault and Sexual Misconduct, W ESTAT (2015), http://perma.cc/M7N9-W6JW. Certain fields of graduate study seem to be particularly problematic for women. One study found that fully 75% of women graduates of PhD programs in psychology had been sexually harassed by a faculty member during the graduate studies. See Schneider et al., Sexual Harassment Experiences of Psychologists and Psychological Associates During Their Graduate School Training, 11 Canadian J. Hum. Sexuality (2002).

marketing seminar class for the PhD program, for being theoretically sound, researchable and interesting.

38.     As the spring semester progressed, the extent to which Dr. Laran ridiculed and humiliated Plaintiff intensified.  Plaintiff sensed that Dr. Laran felt the constant need to diminish her and that he took pleasure in humiliating her privately and referring to her as a "boring mom" in public conversations.  This continued ridicule and humiliation by her academic mentor and research advisor became so severe, pervasive and objectively offensive that it negatively impacted her ability to successfully obtain the education that Plaintiff wanted and constituted a hostile environment for her to complete her academic goals.

39.     Because of the ridicule of Dr. Laran, and the approaching deadline for completion of the first-year research assignment, Plaintiff asked Dr. Irmak if he would consider becoming her academic mentor and research advisor and that her final paper for his marketing seminar class be the basis for her first-year project as he had found it worthy of exploration.  Dr. Irmak indicated a willingness to be her first-year advisor and to supervise her first-year project.

**F. Dr. Laran's Threat to Destroy Plaintiff's Academic Career if She did not Continue Under His Mentorship.**

40.     When Plaintiff communicated her decision to Dr. Laran via email, their usual medium of communication, he immediately called her on her cell phone and indicated his outrage with her decision.  In that telephone call, Dr. Laran threatened to jeopardize Plaintiff's academic future at UM and beyond, unless she continued having him as her academic mentor and research advisor.  He reiterated that he was well-connected and respected in the field (i.e. the marketing faculty of other institutions), and "that if Ana did not have him as first-year project advisor and academic advisor at large, he would make sure Ana's academic career would be over before it even began."

41.     Because Dr. Laran's excellent reputation had been confirmed by Dr. Fitzsimmons and her fear that Dr. Laran would make good on his threat to destroy her career, Plaintiff decided to find a middle ground where she would work on the research idea she had developed in Dr. Irmak's seminar, but that it would be under the mentorship of Dr. Laran, and not Dr. Irmak.  Going forward, she also feared that if she raised her concerns about Dr. Laran to others that he would make good on his threat to destroy her career.

42.     Based upon these events, Plaintiff concluded that not only was Dr. Laran an ego-maniac but that he was intentionally mentally abusive to her.  She realized that Dr. Laran was not going to allow her to work with anyone else for her dissertation and that he was prepared to do everything in his power to damage her future career if she did not continue under his mentorship. She also came to understand that his continued and repeated intimidation, ridicule and insult of her was discriminatory in nature and was rooted in gender bias, an understanding that was solidified when another female joined the PhD program and she also experienced similar harassing and abusive treatment from Dr. Laran.

43.     In the fall of 2015, Plaintiff presented her summer project findings and officially passed her first year of the program.  On a going forward basis, Plaintiff intentionally decided to limit her interactions with Dr. Laran to emails to the greatest extent possible because email communication was both efficient but also formal in structure, providing a safe boundary from Dr. Laran's continued ridicule and abusive behavior.

**G. Dr. Laran Continues his Harassment of Plaintiff While her Academic Mentor and Research Advisor.**

44.     Despite Ana's efforts to distance herself and avoid uncomfortable situations with Dr. Laran, with him as her academic mentor and research advisor, additional offensive and

inappropriate sexual harassment of Plaintiff continued in the second year of the PhD marketing program.

45.     In October of 2015, Ana attended a marketing conference, the Association for Consumer Research (ACR) conference in New Orleans, that Dr. Laran also attended.  They took the same plane flight to the conference and upon landing, Dr. Laran suggested that Plaintiff share a taxi with him to the hotel where the conference was being held.  On their way to finding a taxi stand, Ana and Dr. Laran ran into a colleague of Dr. Laran and some of the PhD students from a Midwest university, who were all going to the same conference.  In the end, they shared a taxi van with Dr. Andrew Stephen and two female PhD students from that university.

46.     During the ride, Dr. Laran brought up the topic of that year's job market candidates (i.e. the PhD students interviewing for first-time jobs).  Conscious that Plaintiff and the other female PhD candidates were listening to his discussion, Dr. Laran stated that the PhD candidate who had secured the most interviews, was able to achieve this by socializing with faculty at bars during marketing conferences despite her mediocre research. He proceeded to state that by sleeping with influential faculty, she secured job security.  To Plaintiff's relief, Dr. Laran's colleague, Dr. Stephen interrupted him and suggested that maybe this was better discussed away from the presence of the female PhD students.

47.     This incident was another example of a sex-specific conversation by Dr. Laran aimed to humiliate, ridicule and intimidate Plaintiff and the other female PhD candidates present. Plaintiff understood this to be Dr. Laran's underhanded way of intentionally communicating that female PhD students could secure an academic job by socializing and having sexual relations with established faculty.  Being that the PhD students in the taxi van were all female, this message was insulting, demeaning, and sexist.  It was intended to suggest that female PhD students could only

achieve such status (i.e. a top job market candidate) if they engaged in sexual relations or succumbed to a specific social gender role.

48.     This same message was subsequently repeated later in the semester during one of Dr. Laran's PhD seminar classes.  This time, the audience was UM marketing PhD students, all males but Ana.  This time, it was clear that Dr. Laran aimed to sexualize and discredit top job market candidate's accomplishments and ascribe her success in job market interviews to her sexuality and immorality.  It was apparent that in Dr. Laran's mind, the fact that this female, who like Ana graduated from Wharton, had worked with some of the most prominent marketing researchers, and had published three articles while a student had nothing to do with her success. Instead, Dr. Laran articulated that her achievement was purely driven by her socializing with faculty, hanging out at bars and drinking with professors during marketing conferences, and allegedly having casual sexual relationships with male faculty members.

49.     In both instances, Ana was profoundly disgusted as she perceived that Dr. Laran was not just trying to send her a message but was also trying to influence the perspective of impressionable young males who were PhD candidates and her peers.  She also noticed that he treated her differently than the male PhD candidates.

50.     Later in the spring semester of 2017, while attending another marketing conference in Tampa, Florida, Ana learned from another female candidate that she was not the only female PhD candidate that Dr. Laran had sexually harassed.  During a dinner with a former UM PhD student, Ana was told of Dr. Laran's known pattern of sexually harassing female PhD candidates. This predatory and disgusting harassment was said to have been witnessed previously particularly at out of town conferences. This former female PhD candidate's recollection of prior incidents of Dr. Laran sexually harassing other female PhD candidates and female faculty reinforced Ana's

concerns about Dr. Laran and led her to even further limit her interactions with him even more, and only socialize with him when others were around.

51.     While Marketing Program Coordinator, Dr. Laran instituted a happy hour Friday gathering at the UM campus bar once per month, where the entire marketing department was invited, and PhD students were urged to attend.  While Ana would attend such events, she would intentionally limit her time there and avoided Dr. Laran in these settings, as he continually made inappropriate comments about females that sexualized and objectified them when in her presence. Moreover, he encouraged the male PhD students to follow suit with inappropriate conversations initiated by him while Plaintiff was present.  These happy hours took on the appearances of "stag parties" where Dr. Laran would command the attention of the male PhD Marketing students in attendance; Ana being the only female in the program at the time. Oftentimes, even the male students became offended by the continual sexual banter in the presence of Plaintiff.

52.     If anything, this pattern of deliberate sexual harassment increased over the course of time as Dr. Laran gained his full tenure with UM and was elevated to the PhD Program Coordinator.

53.     Ana's efforts to distance herself from Dr. Laran in social settings and avoidance of these uncomfortable situations did not go unnoticed by Dr. Laran.  He often called out Ana in front of her peers as "the boring mom, who didn't know how to party."  These comments were intended to ridicule and humiliate Plaintiff, which they did.  She also did not observe Dr. Laran ridicule or humiliate the male students that he was mentoring in the same manner.

54.     Later that semester, a handful of PhD Program applicants were visiting campus and Dr. Laran planned yet another bar outing and informed Ana and all the PhD students that they were expected to attend to show the applicants how much fun the Marketing PhD Program was. Since again Ana is a mother to a young child, she only stayed an hour at the event, as was her habit.  Before she left, Dr. Laran appeared to have drunk too much and Ana wanted to avoid yet another inappropriate incident with him.

55.     The next morning, Plaintiff learned upon picking up the PhD applicants from their hotel from those applicants that Dr. Laran had indeed behaved inappropriately, as in "too friendly" and "too forceful" towards one of the female applicants such that one of the male student applicants felt obligated to stay with Dr. Laran and the female, and make sure that she made it safely back to her hotel room alone.  While Ana did not witness the sexually harassing behavior that evening, it seemed very plausible given his pattern of behavior toward Plaintiff, the other sexual harassing incidents that she had seen first-hand, and Dr. Laran's attitude towards females in general.

56.     At that point in time, in the late second semester, Ana determined that she needed to find an exit plan as she did not want Dr. Laran to be her dissertation chair.  Plaintiff realized that she could not be subject to Dr. Laran's continual inappropriate sexual innuendo comments, ridicule and belittling because of her gender, and the hostile sexual environment created by Dr. Laran for another two to three years while she completed her dissertation.  The hostile environment that existed between Dr. Laran and Ana had become so severe, pervasive and objectively offensive that it began to deprive her of the access to the benefits of the PhD Marketing Program that she needed in order to obtain her academic degree, and in turn deprive her of her goal of being a marketing professor.

57.     Given Dr. Laran's promotion as PhD Program Coordinator and promotion to full tenure despite the actual knowledge of the other faculty members of his highly inappropriate behavior toward Ana and other females in the UM Business School, and his direct threats of retaliation if Ana changed her advisor, Ana found it necessary to build multiple alliances with other faculty members in hopes of salvaging her goal of attaining a PhD from the Program.

58.     Separate and apart from the research work that Ana was required to do with Dr. Laran as her research advisor, she developed independent research projects with other faculty members explaining to Dr. Laran that it was intended to enhance her networking and exposure among the faculty and thereby help her in finding an academic job in the future.  Dr. Laran seemed to accept that explanation from Ana as long as his research assignments were her focus.

59.     In Ana's third-year in the Program, Dr. Chris Janiszewski joined the UM Business School.  He had been Dr. Laran's academic mentor and dissertation chair and was thus more senior and accomplished.  He was also highly admired and respected by Dr. Laran.

60.     Ana immediately identified Dr. Janiszewski as a possible exit strategy and began to work on a project with him.  Between August and November 2016, Ana slowly shifted her energy away from the research she was conducting with Dr. Laran to place greater focus on her work with Dr. Janiszewski.

61.     Simultaneously, Dr. Laran continued to criticize Plaintiff's research ideas and often accused Ana of not knowing how to make the "data work."  While he never stated outright that Plaintiff should be manipulating the data to support her theories (i.e. committing fraud), this comment became such a reoccurring comment, only delivered orally in person and in such a curious tone, that it was clear to Ana that Dr. Laran wanted her to manipulate the data to make

18

their research findings statistically validated.  Plaintiff refused to follow Dr. Laran's suggestions in this regard.

62.     After it was clear that Ana would not be able to work with Dr. Laran on her dissertation, Ana approached Dr. Janiszewski to ask him if he would be willing to be her dissertation chair.

63.     This exit strategy backfired for Plaintiff as Dr. Janiszewski stated that he needed to consult with Dr. Laran to learn more about the role of a dissertation chair at UM and once he obtained such information, he would get back to Plaintiff with a response.

64.     As Dr. Laran had threatened and promised in Plaintiff's first-year if she attempted to move from under his mentorship, he proceeded with a campaign to assure that Plaintiff's academic career "was over before it even began."  Instead of hearing from Dr. Janiszewski, Plaintiff was called into Dr. Laran's office and informed that Dr. Laran had called a meeting with the entire marketing department to discuss her and that none of the faculty wanted to be her dissertation chair.  Such a meeting was totally inappropriate as the protocol was that each student must independently find their own dissertation chair.

65.     Upon learning of Ana's efforts to find another faculty member to be her dissertation chair, Dr. Laran sabotaged her chances of securing a dissertation chair from among the other faculty members thereby depriving her of the educational opportunity to complete the Marketing PhD Program and actively undertook in his position as PhD Program Coordinator to blackball her necessary efforts to find a dissertation chair.

66.      Plaintiff was disappointed with Dr. Janiszewski for not agreeing to be her dissertation chair, but later learned that Dr. Janiszewski could not be her dissertation chair because he was leaving the UM Business School.  She also learned that Dr. Laran had not called a meeting

of all faculty as he had represented but lied to Ana in that regard so that she would not ask other marketing faculty to be her dissertation chair.  However, he did privately use his influence to detrimentally impact her career as Ana's mentor and advisor and being one of the most prolific of the fully tenured professors in the UM Business School, and as the Coordinator of the PhD Program.  Given his positions, he was able to significantly influence the other faculty members so that they would not agree to act as her dissertation chair. Without a dissertation chair, Plaintiff found herself without resources to complete the Program.

67.     Because of Ana's good academic standing and how the Program was structured, Dr. Laran could not independently dismiss her from the Program, but Ana was informed that she had until the end of the spring semester of 2017 to secure a dissertation chair and form a dissertation committee.

68.     Dr. Laran undertook a campaign to discourage all the other faculty members from assisting Plaintiff in her efforts.   While emotionally devasted, Plaintiff met with the other marketing research professors to plead her case and convince one of them to be her dissertation chair.  While doing so, other faculty members, including senior faculty members, revealed to Ana that Dr. Laran was known to be "trouble," he was campaigning to blackball her, and that it was well-known that Plaintiff had been suffering under Dr. Laran's mentorship.  It was further revealed that the entire marketing department, including senior faculty, was quite aware of his sexually harassing behavior towards Ana and other female students, but other faculty members would not do anything because they were afraid of him, his position as PhD Program Coordinator, and because of his publishing accomplishments.

69.     More shocking was the fact that despite all the members of the marketing department, including more senior individuals than Dr. Laran knowing and being on notice of his sexual harassment of females, lack of respect for others and sexist opinions, the UM Business School had placed Dr. Laran in a position of power as the PhD Program Coordinator and given him a full professorship because of his publishing accomplishments.  The other faculty members revelations about Dr. Laran and his history of deliberate sexual harassment signaled to Plaintiff that no one was going to stand up against him, and that if he wanted Ana out of the Program that no one would stand in his way – including the entire UM Business School.

70.     In April of 2017, Plaintiff was advised that she would be given one last chance to form a dissertation committee consisting of three faculty members, Dr. Howard Marmorstein, Dr. Caglar Irmak and Dr. Michael Tsiros.  What was proposed was a highly unorthodox and totally unprecedented approach for selection of a dissertation committee for Plaintiff. Plaintiff subsequently learned that this process was created as an exercise meant to release UM, UM Trustees, and the UM Business School from potential liability down the road.  Following this process, Plaintiff was asked to put together a dissertation proposal without assistance from any third party, that explored a research idea that those three faculty members had to all agree would be worthwhile to investigate.  Based on Ana's write-up, expressly to be done without any third-party assistance, they would then decide whether it would be worthwhile to collect data, and if after analyzing the data, they thought it would be feasible, they would become Plaintiff's dissertation committee.

71.     Not surprisingly, after submitting the written proposal, Plaintiff was informed that the dissertation proposal was not good enough for her to continue in the Program.   Ana's subsequent meeting with these faculty members gave her further indications that this process was

mere subterfuge for dismissing her from the Program. Further, these same faculty members, including Dr. Howard Marmorstein, shared their direct knowledge to Ana of Dr. Laran's sexually harassing and highly inappropriate behavior towards Plaintiff and other females.

72.     Because of her dismissal from the PhD Program, Plaintiff was not able to attain her goal of becoming a marketing professor at a major university.  Ana was physically and mentally devasted by the sexual harassment, wrongful retaliation and the failure of Defendants to address the sexual harassment and hostile work environment that the entire marketing faculty knew existed because of Dr. Laran's actions.

73.     As a result of Dr. Laran's deliberate and intentional acts against Plaintiff, and UM, UM Business School and UM Trustees knowing refusal to address these concerns, Ana suffered a devastating blow to her career, she was mentally scarred resulting in her marriage being in a shambles, and being treated by a psychologist given the trauma that she had endured from Dr. Laran on a repeated-basis over her tenure in the Program.

74.     Only after Plaintiff was dismissed and other female students and faculty members repeatedly complained did UM undertake a Title IX Grievance Procedure that should have been undertaken many years earlier that could have prevented the damages that Plaintiff has sustained.

**COUNT I**
**Violation of Title IX**
**(Against UM, UM Trustees and UM Business School)**

75.     Plaintiff alleges and incorporates the allegations in paragraphs 1 - 74 as if fully set forth herein.

76.     Over the course of her enrollment in the PhD Marketing Program at the UM Business School, Plaintiff was subject to a continuing campaign of sexual harassment by her primary mentor and research advisor, Dr. Laran.  Dr. Laran was also promoted to become the PhD Marketing Program Coordinator during Plaintiff's enrollment.

77.     The harassment of Plaintiff by Dr. Laran was premised upon Plaintiff's sex rather than some other motivation.

78.     When Plaintiff attempted to remove herself from Dr. Laran's continued harassment and advise the other faculty of this hostile environment, she was advised by faculty members that they already knew of his harassment of the Plaintiff, but they were deliberately indifferent to the harassment out of fear of Dr. Laran and his position as PhD Marketing Program Coordinator.

79.     Moreover, when Dr. Laran was advised that Plaintiff had made efforts to remove herself from the continual harassment by finding another faculty advisor, he set out on a campaign to have Plaintiff dismissed from the Program thereby denying the plaintiff the benefits of the PhD Marketing Program.

80.     The other faculty and staff of the UM Business School, including senior faculty, had direct notice of the sexual harassment that had transpired by Dr. Laran against Plaintiff and other women previously, but they took no action to address or remedy the harassment until after Plaintiff had been dismissed from the Program. Further, faculty and staff had notice of Dr. Laran's unfair treatment of Ana and failed to promptly and adequately address such continued harassment.

81.     Defendants also failed to take appropriate action to either remove or appropriately supervise Dr. Laran.

82.     Dr. Laran's harassment and campaign to have Plaintiff dismissed from the PhD Marketing Program was within the substantial control of UM, the UM Trustees and the UM Business School such that Plaintiff's concerns could have been addressed and remedied and they were not.

83.     At all relevant times, Defendants had a duty to provide a safe and nondiscriminatory environment for its students, including Ana, free from sexual harassment.

84.     Because of the sexual harassment that Plaintiff sustained, Plaintiff incurred severe mental and emotional distress and humiliation that resulted in her need to seek psychological counseling for the course of several months.

85.     Plaintiff was also denied an opportunity to complete the PhD Marketing Program and achieve her career goal of becoming a marketing professor at a major university.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor and against Defendants UM, UM Trustees and UM Business School, and award Plaintiff compensatory damages for the mental and emotional distress and humiliation that she experienced, all monetary damages suffered as a result of Defendant's deliberate indifference and tacit authorization of Dr. Laran's sexual harassment of Plaintiff, as well as attorneys' fees and costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT II**
**Violation of 42 U.S.C. § 1983 Action for Deficient Training and Supervisory**
**Practices Causing Constitutional Harm**
**(Against UM, UM Trustees and UM Business School)**

86.     Plaintiffs alleges and incorporates the allegations in paragraphs 1 - 74 as if fully set forth herein.

87.     Plaintiff was victim to a continuing, widespread, persistent pattern of unconstitutional conduct by Dr. Laran and the faculty of the UM Business School.

88.     Dr. Laran's sexual harassment and mistreatment of Plaintiff and other women on the faculty and in the PhD Marketing Program was known by the other faculty, UM, the UM Business School and the UM Trustees.

89.     Over the course of Plaintiff's enrollment in the PhD Marketing Program, there was deliberate indifference to and tacit authorization of Dr. Laran's inappropriate sexual harassment of Plaintiff and other women by the UM Business School, its faculty and staff after being on notice of that misconduct.

90.     At all relevant times, Defendants UM, the UM Business School and the UM Trustees had a duty to provide a safe and nondiscriminatory environment for its students and staff, free from sexual harassment, and to resolve such misconduct promptly, equitably and adequately.

91.     Nevertheless, at all relevant times, Defendants UM, the UM Business School and the UM Trustees grossly failed to adequately train and supervise its agents and employees about the risks of sexual harassment of students and staff under Dr. Laran's supervision.

92.     Indeed despite senior staff having direct notice of Dr. Laran's posed serious danger and sexual harassment of female students, Defendants UM, the UM Business School and the UM Trustees grossly failed to adequately supervise Dr. Laran, thereby continuing to allow him unfettered access to Plaintiff and other female students on the premises.

93.     In addition to Defendants' gross failure to adequately supervise Dr. Laran, Defendants also had grossly inadequate practices with respect to training staff to adequately report, investigate, and respond to complaints of sexual misconduct to protect the students under its care from sexual harassment.

94.     By establishing and implementing grossly inadequate official practices with respect to training and supervising its staff about the risks of sexual harassment of students under Dr.

Laran's care, Defendants were deliberately indifferent to the constitutional rights of Plaintiff and other female students.

95.     As a result of Defendant's grossly inadequate official policies and practices, Plaintiff was continually sexually harassed by Dr. Laran.

96.     As a further result, Plaintiff has suffered, and continues to suffer, substantial injuries, harm and damages. This includes, but is not limited to, severe and permanent emotional, psychological, pain and suffering, depression, fear, anxieties, inability to function normally in social situations, shame, humiliation, and the inability to enjoy a normal life. Such harms and injuries are continuing and permanent. Plaintiff has also undergone psychological treatment and incurred other expenses.  Plaintiff was also unfairly excluded from the PhD Marketing program and was denied the opportunity to achieve her career goal of being a marketing professor at a major university.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor and against the Defendants UM, UM Trustees and UM Business School, and award Plaintiff compensatory damages, punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

### COUNT III
### Intentional Infliction of Emotional Distress
### (Against Dr. Laran)

97.     Plaintiff alleges and incorporates the allegations in paragraphs 1 – 74 as if fully set forth herein.

98.     Dr. Laran intentionally or deliberately intended to harass and retaliate against Plaintiff based upon her sex and age.

99.     This repeated conduct was intended to and did cause Plaintiff severe emotional distress, including mentally scarring her marriage and family-dynamic, giving Ana a devasting blow to her previously spotless and highly regarded career, and being treated by a psychologist given the trauma that she had endured from Dr. Laran on a repeated-basis over her tenure in the program.

100.    Dr. Laran knew or should have known that repeated harassment of Plaintiff would likely result in severe emotional distress.

101.    Dr. Laran's highly inappropriate conduct was outrageous to go beyond all bounds of decency and to be regarded as odious and utterly intolerable in a civilized community, and especially goes beyond the bounds of decency in such a highly regarded educational institution.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff, demands a jury trial on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil procedure.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor and against the Defendant, and award Plaintiff all monetary damages suffered as a result of Defendant's intentional acts, as well as her costs, prejudgment interest incurred in prosecuting this action, and such further relief as the Court deems just.

Dated: May 22, 2019                             Respectfully submitted,

                                                MARK MIGDAL & HAYDEN
                                                80 S.W. 8th Street, Suite 1999
                                                Miami, Florida 33130
                                                Telephone: (305) 374-0440

                                                By: *s/ Donald J. Hayden*
                                                     Donald J. Hayden
                                                     Florida Bar No. 097136
                                                     don@markmigdal.com
                                                     eservice@markmigdal.com

27